**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| EISAI INC., | : CIVIL ACTION NO. 08-4168 (MLC) |
| Plaintiff, | : **MEMORANDUM OPINION** |
| v. | : |
| SANOFI-AVENTIS U.S., LLC,<br>et al., | : |
| Defendants. | : |

RECEIVED

AUG 1 0 2010

AT 8:30_____M
WILLIAM T. WALSH
CLERK

**COOPER, District Judge**

The plaintiff, Eisai Inc. ("Eisai"), brought this action alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Section 3 of the Clayton Act, 15 U.S.C. § 14, and the New Jersey Antitrust Act, N.J.S.A. §§ 56:9-3 to -4.  (Dkt. entry no. 1, Compl.)  Defendants, sanofi-aventis U.S., LLC and sanofi-aventis U.S., Inc. (collectively, "Defendants" or "sanofi-aventis"), moved to dismiss the Complaint or, in the alternative, for summary judgment in their favor, on the basis that Eisai lacks standing to bring the action.  (Dkt. entry no. 75, Mot. Dismiss.)  The Court considers the motion one for summary judgment, in light of the limited discovery conducted thus far as to standing, and because few factual disputes or credibility issues exist at this juncture.

1

The Court held oral argument on the motion on June 29, 2010.  For the reasons stated herein, the Court denied the motion.  (Dkt. entry no. 113, 6-29-10 Minute Entry.)

### BACKGROUND

I.   **The Parties, and the Low Molecular Weight Heparin Market**

   A.   **Eisai**

Eisai is a party to a contract with pharmaceutical manufacturer Pfizer, Inc. ("Pfizer") providing Eisai exclusive distribution rights to Pfizer's low molecular weight heparin ("LMWH") drug, Fragmin, which is an injectable anticoagulant product.  (Dkt. entry no. 80, Pl. Opp'n Br. at 3 n.1; dkt. entry no. 81, Cert. of Timothy Duffy ("Duffy Cert."), Ex. H, Supply, Distribution, and Profit Sharing Agreement dated September 27, 2005 ("2005 Agreement").)  Other pharmaceutical products in this class of LMWH anticoagulants include sanofi-aventis's Lovenox, GlaxoSmithKline's Arixtra, and Celgene's Innohep.  (Compl. at ¶¶ 52-56.)

Pursuant to the 2005 Agreement, Eisai markets, sells, and distributes Fragmin throughout the United States.  (Id. at ¶ 14.)[1] ██████████████████████████████████████████

-----------------------------

[1] ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

Counsel for Eisai described WAC as the "benchmark" price "advertised to hospitals, to buying organizations as a basic set price from which [Eisai] can discount . . . [and] make other rebates." (Pl. Opp'n Br. at 10; 6-29-10 Hr'g Tr. at 47:13-25.)

3



and the Court presents a simplified view of these post-generic contingencies for purposes of this opinion only.

[REDACTED]

**B.    sanofi-aventis**

Sanofi-aventis manufactures, markets, sells, and distributes Lovenox, a LMWH anticoagulant comprising in excess of 90% of the market share for LMWH anticoagulants.  (Compl. at ¶ 66; Duffy Cert., Ex. A, 2-12-09 E-mail ([REDACTED]).)  Sales of Lovenox exceeded $2 billion in 2007.  (Compl. at ¶ 31.)

Eisai alleges that sanofi-aventis protects its "monopoly power" through a "discount program" that requires hospital customers to purchase at least 90% of its LMWH anticoagulant purchases from sanofi-aventis in order to avoid forfeiting a discount of up to 30% of the customer's total Lovenox purchases.

(Compl. at ¶ 3.)[3]  If a customer purchases less than 75% of its
LMWH anticoagulant requirements from sanofi-aventis, the
customer receives only a 1% discount.  (Id.; see also Duffy
Cert., Ex. B, Lovenox Acute Contract Value Program at 6-9, 12-
16.)  Eisai thus contends that sanofi-aventis's discount program
forecloses competitors from obtaining more than a 10% share of
the LMWH drug market by effectively requiring hospital customers
to agree to take at least 90% of its requirements from sanofi-
aventis.  (Id. at ¶ 7.)  Sanofi-aventis responds that its
discount program permits consumers to purchase LMWH
anticoagulant products from other manufacturers, and the "long-
term and sustained presence of other anticoagulant drugs . . .
demonstrates that many customers do in fact purchase competing
anticoagulants."  (Dkt. entry no. 76, Def. Br. at 14.)

## II.  Procedural History

The Court previously denied sanofi-aventis's motion to
dismiss the Complaint for failure to state a claim, holding that
Eisai had alleged sufficient facts to support each of the
antitrust violations alleged.  (Dkt. entry no. 59, 6-12-09
Order; dkt. entry no. 61, 6-12-09 Hr'g Tr. at 71:6-73:4.)  In

---

[3] The indications for LMWH anticoagulants dictate that most
initiation and administration of LMWH treatment occurs in
hospitals.  (See Compl. at ¶¶ 49-50.)

denying the motion to dismiss, the Court expressed concern as to sanofi-aventis's arguments regarding the statute of limitations and Eisai's standing.  (6-12-09 Hr'g Tr. at 73:17-74:1.) Accordingly, the Court ordered that the parties could conduct "limited discovery on the issues of the statute of limitations and standing," and granted leave to sanofi-aventis to move again to dismiss the Complaint based on either of those grounds.  (6-12-09 Order at 2.)  The Court ordered that while discovery on the standing issue would be one-way, i.e., from Eisai to sanofi-aventis only, discovery on the statute of limitations issue would be reciprocal.  (6-12-09 Hr'g Tr. at 75:15-16.)

The parties indicated that no two-way discovery on the statute of limitations issue had commenced, and the issue has now been deferred until more comprehensive discovery occurs, essentially by mutual agreement.  (Dkt. entry no. 116, 6-29-10 Hr'g Tr. at 6:4-24; see also Duffy Cert. Ex. F, 9-8-09 Letter from Defendants' counsel to Judge Arpert.)[4]  Thus, sanofi-aventis's motion sought dismissal or summary judgment in its

---

[4] Eisai argues in its opposition brief that the statute of limitations issue "should be deemed abandoned at this point in the proceeding in light of sanofi's failure to accept the Court's invitation to argue the issue and apparent concession that the issue was meritless from the outset."  (Pl. Opp'n Br. at 4.)  We express no opinion on that argument here.

favor based on the standing issue alone.[5]

**DISCUSSION**

## I.   Applicable Legal Standards

### A.   Summary Judgment

The parties appear to agree that the instant motion seeks dismissal of the Complaint, or in the alternative summary judgment in favor of sanofi-aventis, on the basis of Eisai's alleged lack of prudential antitrust standing, rather than Article III jurisdictional standing.  (See Def. Br. at 15; Pl. Opp'n Br. at 20 n. 13 & 21 n. 14.)  Because a motion to dismiss for lack of prudential standing in the antitrust context is governed by Rule 12(b)(6) rather than Rule 12(b)(1), and the Court prefers to utilize the materials outside the pleadings presented by the parties in this instance, we view the motion as one for summary judgment.  Fed.R.Civ.P. 12(d); City of Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 264-65 (3d Cir. 1998).

The standard for a motion for summary judgment is well-settled and will be briefly summarized here.  Rule 56(c)

---

[5] At oral argument, the Court advised the parties that it would not revisit the issue of whether Eisai had stated a claim upon which relief could be granted, and thus would not address sanofi-aventis's contentions that no antitrust violation exists. (6-29-10 Hr'g Tr. at 99:13-18.)

provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In making this determination, the Court must "view[] the record in the light most favorable to the non-moving party and draw[] all inferences in that party's favor."  United States ex rel. Josenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009) (citing Abramson v. William Patterson Coll., 260 F.3d 265, 276 (3d Cir. 2001)).

**B.   Antitrust Standing**

Section 4 of the Clayton Act provides a private cause of action to persons injured in their "business or property by reason of anything forbidden in the antitrust laws," and allows recovery of treble damages, costs, and a reasonable attorney's fee.  15 U.S.C. § 15.  Section 1 of the Clayton Act defines "antitrust laws" as the Sherman Act, the Wilson Tariff Act, the Clayton Act, and the Robinson-Patman Act.  15 U.S.C. § 12(a); see Gregory Mktg. Corp. v. Wakefern Food Corp., 787 F.2d 92, 93 n.3 (3d Cir. 1986).

The question of whether "a plaintiff is the proper party to bring an antitrust action" pursuant to 15 U.S.C. § 15 requires a court to "evaluate the plaintiff's harm, the alleged wrongdoing

by the defendants, and the relationship between them." Assoc.
Gen. Contractors of Cal., Inc. v. Cal. State Council of
Carpenters, 459 U.S. 519, 535 & n.31 (1983) ("AGC"). The "AGC
factors" a court must consider in determining whether a
plaintiff has antitrust standing include:

> (1) the causal connection between the antitrust
> violation and the harm to the plaintiff and the intent
> by the defendant to cause that harm, with neither
> factor alone conferring standing; (2) whether the
> plaintiff's alleged injury is of the type for which
> the antitrust laws were intended to provide redress;
> (3) the directness of the injury, which addresses the
> concerns that liberal application of standing
> principles might produce speculative claims; (4) the
> existence of more direct victims of the alleged
> antitrust violations; and (5) the potential for
> duplicative recovery or complex apportionment of
> damages.

City of Pittsburgh, 147 F.3d at 264 (quoting Barton & Pittinos,
Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 181 (3d Cir.
1997) (footnote omitted)); see also Brunswick Corp. v. Pueblo
Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (defining "antitrust
injury" but noting that a proper plaintiff "must prove more than
injury causally linked to an illegal presence in the market").
The antitrust standing inquiry, therefore, "is not a black-
letter rule, but rather, is essentially a balancing test
comprised of many constant and variable factors." City of
Pittsburgh, 147 F.3d at 264-65 (internal quotation and citation
omitted).

If a plaintiff is unable to show antitrust injury, further examination of the remaining AGC factors is unnecessary.  Id. at 265; Barton & Pittinos, 118 F.3d at 184 n.9.  "Generally, the plaintiff seeking relief under the antitrust laws must be either a competitor or consumer of the defendant. . . . In certain antitrust suits, even where a plaintiff is not a competitor or consumer in the relevant market, that plaintiff may still establish an antitrust injury when the harm is 'inextricably intertwined' with the defendant's wrongdoing."  McCullough v. Zimmer, Inc., No. 08-1123, 2009 WL 775402, at *5 (W.D. Pa. Mar. 18, 2009), aff'd, No. 09-2105, 2010 WL 2178554 (3d Cir. June 1, 2010); see also Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 76-77 (3d Cir. 2000).

## II.  Legal Standards Applied Here

The Supreme Court in AGC observed that the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party . . . to perform the office of a private attorney general."  AGC, 459 U.S. at 542.  Sanofi-aventis contends that Pfizer, not Eisai, would be the only proper party to bring the instant action.

### A.    Summary of sanofi-aventis's Arguments

11

Sanofi-aventis urges the Court to find that Eisai lacks antitrust standing because it is a mere distributor of the product produced by Pfizer.  (See Def. Br. at 14-15.)

In Ethypharm S.A. France v. Abbott Labs, 598 F.Supp.2d 611, 615-19 (D. Del. 2009), the court found that a French pharmaceutical manufacturer had standing under the Sherman Act to challenge the defendant pharmaceutical manufacturer's allegedly anticompetitive actions, even though the plaintiff did not itself market and distribute the product in the United States but did so through a third party distributor.  The plaintiff there "participate[d] in the relevant market through a third party."  Id. at 618.  The court deemed that the plaintiff should be permitted to challenge the defendant's restrictive dealings with respect to the third party, finding that the plaintiff's choice to utilize an exclusive distributor for its product rather than organize its own sales force did not require the plaintiff to "forfeit the protection of the antitrust laws." Id.  However, in that case, the defendant had entered into an agreement with the plaintiff's exclusive distributor that the defendant would not sue the distributor for patent infringement if the distributor limited its own ability to sell the product domestically.  Id. at 618 & n.9.  It was that alleged anticompetitive conduct between the defendant and the

plaintiff's distributor that formed the basis of the plaintiff's antitrust claims.  <u>Id.</u>  Sanofi-aventis contends that <u>Ethypharm</u> stands for the proposition that "as between the owner of the product and its exclusive U.S. distributor . . . the owner of the product had standing to assert an antitrust claim against a competing manufacturer," such that "any purported injury suffered by Eisai is entirely derivative of Pfizer's injuries, as the owner and manufacturer of Fragmin."  (Def. Br. at 23.)

Sanofi-aventis contends that under the 2005 Agreement, Eisai is ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████████████████████████████ ████████████████████  In contrast, the 2005 Agreement provides that ███████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████ ██████████████████████████████; Def. Br. at 19-20.)  Sanofi-aventis points to an internal Eisai document providing an overview of the 2005 Agreement, summarizing ██████████████████ ████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████

13



The 2005 Agreement provides for

████████████████████████████████████████████████████

Sanofi-aventis highlights that the 2005 Agreement ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

     Sanofi-aventis asserts that "Pfizer's superior interest" in

Fragmin is evidenced by ███████████████████████████████

████████████████████████████████████████████████████

████████████████████ Sanofi-aventis further

observes that while Pfizer is required to █████████████

███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

     Sanofi-aventis compares Eisai's role in the LMWH

marketplace to that of the plaintiffs in McCullough, owners of a small business that sold, marketed, and serviced orthopedic products that they purchased from various manufacturers pursuant to contracts with those manufacturers providing for exclusive rights to sell and service the manufacturers' products.  (Def. Br. at 21-22.)  McCullough, 2009 WL 775402, at *1.  The McCullough plaintiffs claimed they were shut out from the orthopedic products market because the defendant manufacturers made "illegal payments" to physicians, hospitals, and health systems in exchange for exclusivity in supplying orthopedic products.  Id. at *2.  The district court in McCullough dismissed the complaint for lack of antitrust standing, characterizing the plaintiffs as "nothing more than distributors, or intermediaries through which larger orthopedic supply manufacturers . . . distributed their products." McCullough, 2009 WL 775402, at *6-*7.  The Third Circuit affirmed, agreeing with the district court that the plaintiffs' allegations established only that the plaintiffs were "commission-based sales representatives who did business with competitors and consumers in the market . . . not as competitors or consumers themselves."  McCullough, 2010 WL 2178554, at *3. Thus, sanofi-aventis argues that Eisai is not a competitor of sanofi-aventis in the marketplace, and therefore not the proper

16

plaintiff to pursue the antitrust claims related to the Lovenox discount program.

Sanofi-aventis, in arguing that Pfizer, not Eisai, is the appropriate plaintiff in this action, observes that the 2005 Agreement



(Def. Br. at 24.)

**B.   Summary of Eisai's Arguments**

Eisai argues that it directly competes with sanofi-aventis and is a proper party "to challenge the domestic anticompetitive sales practices of its rival." (Pl. Opp'n Br. at 2.)  Eisai explains that it is the "leading challenger to sanofi" in the LMWH anticoagulant market, with a market share of 5%, followed by GlaxoSmithKline, whose Arixtra has a market share of approximately 2%, and Celgene, whose Innohep has a market share of 1% or less.  (Id. at 6-7 & n.4.)

Eisai contends that as the only entity that can legally sell

and distribute Fragmin in the United States, it "suffers directly from sanofi's exclusionary conduct in marketing, selling, and distributing its Lovenox product." (Id. at 7.) Eisai asserts that under the 2005 Agreement, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Thus, Eisai characterizes the 2005 Agreement as "an asset purchase agreement ██████████ ████████ in the United States with Pfizer remaining as a contract manufacturer and Eisai paying Pfizer 25% of the profits and milestone payments as the purchase price for the product." (Pl. Opp'n Br. at 13.) "Since the execution of the 2005 Agreement, Pfizer has not competed in the United States [LMWH anticoagulant] market." (Id.)

Eisai notes that the 2005 Agreement vested regulatory responsibility for Fragmin in Eisai by transferring the NDA to Eisai for the duration of the agreement. (Id. at 13-14.) Thus, "in the eyes of the United States government, Fragmin is Eisai

in the United States — the FDA does not recognize Pfizer as
having any authority regarding the sale and marketing of Fragmin
in the United States."  (Id. at 15.)

Eisai notes that it, not Pfizer, "maintains the risks and
rewards associated with Fragmin's sales in the United States,"
and therefore "is unquestionably the entity directly and
immediately affected by the anticompetitive obstacles placed in
the United States market by sanofi."  (Id. at 16.)

C.    **Eisai's Standing as an Antitrust Plaintiff**

Applying the factors for determining antitrust standing as
set forth in AGC and City of Pittsburgh, the Court determines
that Eisai has standing to pursue its antitrust claims against
sanofi-aventis.  The first two AGC factors, causal connection
between alleged antitrust violation and harm to plaintiff, and
type of injury alleged, inquire whether the plaintiff has
suffered an "antitrust injury."  See Novell, Inc. v. Microsoft
Corp., 505 F.3d 302, 311 (4th Cir. 2007).  The third, fourth,
and fifth AGC factors pertain to the directness of that injury.
Id.

1.    **Causal Connection between Antitrust Violation and
Harm to Plaintiff**

Sanofi-aventis suggests that Eisai's alleged injury, to the
extent it has suffered any, has roots in its 2005 Agreement with

Pfizer rather than sanofi-aventis's Lovenox discount program.
(See Def. Br. at 25-26 ("Eisai and Pfizer have created a
contractual construct that ████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████
███████.)  Eisai states that it is directly injured by sanofi-
aventis's unlawful foreclosure of competitors, including Eisai,
from the LMWH anticoagulant market.

Eisai's allegations that sanofi-aventis uses its position
as the holder of over 90% of the market share for LMWH
anticoagulants to impose a price penalty on consumers who
purchase less than 90% of their requirements from sanofi-aventis
indicate a causal connection to Eisai's alleged injury of lost
sales and inability to gain market share despite Fragmin's
competitive prices and more flexible contractual terms.  (Compl.
at ¶ 10; see also Duffy Cert., Ex. G, Elhauge Decl. at ¶¶ 2-5.)
Eisai specifically alleges that sanofi-aventis's imposition of
the 90% threshold on consumers wishing to benefit from the
discount program results in "a substantial barrier to inclusion
in hospitals' formularies," wherein formulary status is critical
to competition for sales because most LMWH anticoagulant
treatment is initiated and administered at hospitals.  (Compl.

at ¶ 8.)

A defendant's specific intent to cause injury is relevant to the question of antitrust injury.  AGC, 459 U.S. at 537 n.35; see also Ethypharm, 598 F.Supp.2d at 618 (finding that defendant's actions vis-a-vis third party distributor indicated "an intent to harm Ethypharm, if anyone").  Sanofi-aventis's specific intent to impose price penalties on customers who purchase less than 90% of requirements, as a means of maintaining its market share above 90% levels, is evidenced by the terms of the ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████   Thus, the alleged injury to Eisai is "not merely an indirect or remote consequence of the defendants' actions," but rather the intended consequence of sanofi-aventis's Lovenox discount program.  See Carpet Group Int'l, 227 F.3d at 78.

Nothing in the record supports sanofi-aventis's theory, at

this juncture, that any injury to Eisai inures from its
arrangement with Pfizer.[7]  Eisai, not Pfizer, participates in the
LMWH anticoagulant market in the United States.  Eisai, not
Pfizer, sets the WAC for Fragmin in the United States.  ████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████, it is
Eisai, not Pfizer, that claims it is foreclosed from expanding
its market share beyond 10% due to sanofi-aventis's allegedly
anticompetitive practices.  Thus, this factor weighs in favor of
finding that Eisai has standing.

### 2.    Type of Injury Alleged

Sanofi-aventis contends that Eisai has not alleged the type
of injury that the antitrust laws are intended to prevent,
arguing that its Lovenox discount program has the effect of
lowering prices for LMWH anticoagulants, which is the goal of
the antitrust laws.  (Def. Br. at 26-27.)  However, the Court
has already essentially rejected this argument.

The Court, in denying sanofi-aventis's motion to dismiss,

---

[7] Unlike another case wherein a distributor was found not to
have standing, it appears that the harm suffered by Eisai would
not be redressable through a breach of contract action against
Pfizer.  Gregory Mktg. Corp., 787 F.2d at 98 (holding that
broker could not maintain action under Clayton Act because he
was neither competitor or consumer in the industry, but noting
that broker's loss of future income could be recouped through an
action for breach of contract against manufacturer).

22

previously determined that Eisai's antitrust allegations stated a claim for violations of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act.  (6-12-09 Hr'g Tr. at 71:14-73:4.)  The Complaint alleges that the Lovenox discount program limits the total possible market share for LMWH anticoagulants other than Lovenox to no more than 10%, by essentially forcing hospitals to purchase at least 90% of their needs for such drugs from sanofi-aventis and imposing a price penalty on any consumer who purchases smaller amounts of Lovenox.  (See Compl. at ¶¶ 3-10.)  Eisai's expert notes that foreclosure from the market burdens the entry of new market participants and prevents competitors from expanding enough to achieve their minimum efficient scale.  (Elhauge Decl. at ¶ 3.)  Additionally, Eisai's expert has opined that sanofi-aventis's discount program causes an anticompetitive effect on the market because the exclusionary conditions attached to the different discount levels allow sanofi-aventis to charge higher prices than it otherwise would, "indeed at monopoly levels."  (Elhauge Decl. at ¶ 10.)

We now find for purposes of standing that Eisai complains of an injury "of the type for which the antitrust laws were intended to provide redress":  stifling competition through monopolization, or an otherwise "purposefully anticompetitive scheme" alleged here to be sanofi-aventis's Lovenox discount

program.  Blue Shield of Va. v. McCready, 457 U.S. 465, 483
(1982).  The conditioning of price discounts upon customers
purchasing exclusionary levels of their requirements from an
alleged monopolist effectively forecloses competitors from the
market and prevents customers from dealing in the goods of
competitors.  LePage's Inc. v. 3M, 324 F.3d 141, 158-59 (3d Cir.
2003).  This type of exclusive dealing arrangement "is of
concern under the antitrust laws."  Id.  This factor therefore
favors standing.

### 3.  Directness of Injury

The antitrust laws were not intended "to allow every person
tangentially affected by an antitrust violation to maintain an
action to recover threefold damages for the injury to his
business or property."  McCready, 457 U.S. at 477.  Those
suffering an antitrust injury include competitors or consumers
in the relevant market, as well as those whose harm is
"inextricably intertwined" with the defendant's wrongdoing.
Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris,
Inc., 171 F.3d 912, 926 & n.8 (3d Cir. 1999); Schuylkill Energy
Res., Inc. v. Pa. Power & Light Co., 113 F.3d 405, 415 (3d Cir.
1997) ("A plaintiff who is neither a competitor nor a consumer
in the relevant market does not suffer antitrust injury.").
Sanofi-aventis relies on McCullough and Ethypharm in arguing

24

that Eisai's alleged injury is derivative of injury to Pfizer and thus Eisai is not a proper plaintiff.  (Def. Br. at 27.)

We find that Eisai is a direct competitor of sanofi-aventis in the United States market for LMWH drugs, and that under the 2005 Agreement, any injury to Pfizer would be derivative of the injury to Eisai, not the other way around.  Eisai is the only entity that can legally sell Fragmin in the United States, the relevant geographic market for purposes of Eisai's antitrust claims.  Cf. Barton & Pittinos, 118 F.3d at 180, 184 (finding that marketing company hired to increase demand for defendant's vaccine lacked antitrust  standing, falling into the category of "advertisers and brokers of a good or service [who] are not competitors of companies that actually supply the good or service").  The 2005 Agreement █████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████.  Eisai, not Pfizer, competes with sanofi-aventis for sales in the LMWH anticoagulant market, which Eisai alleges sanofi-aventis has restricted.  Despite sanofi-aventis's efforts to characterize Eisai as a "mere distributor" of Fragmin as opposed to a competitor in the market, the fact remains that Eisai is the only distributor of Fragmin in the United States and accordingly is much more than a "mere" distributor.  Because

Eisai is a direct competitor in the relevant market, as opposed to a middleman, <u>McCullough</u> is inapposite.  We therefore find that this factor favors Eisai's standing.

### 4.    Existence of More Direct Victims

"The existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public in enforcement diminishes the justification for allowing a more remote party to serve as private attorney general."  <u>AGC</u>, 459 U.S. at 542.  Sanofi-aventis contends that "Pfizer, as the owner and manufacturer of Fragmin, is much more directly affected by the alleged foreclosure [from the LMWH anticoagulant market] than Eisai."  (Def. Br. at 28.)  Sanofi-aventis states that Pfizer is more directly affected because it stands to lose ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

███████████

For the reasons already discussed as to the directness of the injury factor, we reject sanofi-aventis's position that Pfizer is a more direct victim of sanofi-aventis's Lovenox discount program than Eisai.  Whereas Pfizer ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████, Eisai stands to suffer harm from the alleged anticompetitive conduct in that ████████████ ████████████████████████████████████████.

Pfizer does not and cannot ██████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████.

Thus, while Pfizer suffers some extent of injury in the form of diminished or lack of profits earned through the profit-sharing agreement (an injury shared, but in greater magnitude, by Eisai), it is Eisai that suffers acutely its alleged inability to expand the market share for Fragmin.  Additionally, it is apparent to the Court that relevant discovery in this action will for the most part come from Eisai, not Pfizer, which lends support to the conclusion that Eisai is the more direct victim.[8]

---

[8]   The Court expects that Pfizer will be amenable to participating in discovery in this action insofar as matters relating to Fragmin pricing practices are relevant.

Comparing the threatened injuries to Pfizer and Eisai, the type of injury that might be suffered by Pfizer—fewer or nonexistent royalties under the profit-sharing arrangement with Eisai—is not an injury of the type intended to be redressed by the antitrust laws, whereas Eisai does suffer the type of injury redressed by the antitrust laws, namely, restraint on its participation in the relevant sales market.  The specific intent by sanofi-aventis to foreclose Fragmin, along with Innohep and Arixtra, from the LMWH anticoagulant market, has only an incidental effect on Pfizer, but affects Eisai directly and contemporaneously.  See Productive Inventions v. Trico Prods. Corp., 224 F.2d 678, 679 (2d Cir. 1955) (holding patentee who granted exclusive license and retained only right to receive royalties did not have standing to pursue treble damages for loss of royalties on sales that might have been made but for antitrust violations of the defendant).  The concerns regarding ███████████████████████████████████████████ ██████████████████████████████████ are more attenuated than Eisai's acute complaint of being foreclosed from the LMWH anticoagulant market now.

### 5. Potential for Duplicative Recovery or Complex Apportionment of Damages

Sanofi-aventis suggests that permitting Eisai to maintain

this action could potentially result in double recoveries against it if Pfizer were to sue on its own behalf. (Def. Br. at 28.) Alternatively, sanofi-aventis states that it would be "difficult to disentangle the relationship between Eisai and Pfizer under the [2005] Agreement" and that the Court and the parties would be required to distinguish between injury to Eisai caused by sanofi-aventis and injury caused by the terms of the 2005 Agreement. (Id. at 29.)

Pfizer has not sued and would likely lack standing because Eisai is a more direct victim. As noted above, Pfizer's injury consists of diminished profits ███████████████████████
███████████████████████. Diminished profits are not the type of injury the antitrust laws are intended to prevent; rather, the threat to competition is. See Eichorn v. AT&T Corp., 248 F.3d 131, 140 (3d Cir. 2001). Because Pfizer does not and cannot directly participate in the LMWH anticoagulant market in the United States, it would be unlikely to prevail in an antitrust action against sanofi-aventis, and thus the potential for double recovery is low.

The apportionment of damages is simplified because Pfizer has no other United States licensees for Fragmin and there are only two additional competitors, Celgene and GlaxoSmithKline, in the LMWH anticoagulant market. Cf. Ethypharm, 598 F.Supp.2d at

618; <u>McCullough</u>, 2009 WL 775402, at *9.  We therefore find that this factor does not weigh against Eisai's standing.

## CONCLUSION

For the foregoing reasons, the Court denied the motion to dismiss or, in the alternative, for summary judgment.  We find at this juncture that the <u>AGC</u> factors favor standing and Eisai is an appropriate antitrust plaintiff.  The Court will issue an appropriate order separately.


                                    ___ s/ Mary L. Cooper
                                    **MARY L. COOPER**
                                    United States District Judge

Dated:    August _10_, 2010


30