**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **EISAI INC.,** | : | **Civil Action No.: 08-4168 (MLC)** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| **SANOFI-AVENTIS U.S., LLC, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| _____ | : | |

**ARPERT, U.S.M.J**

## I.      INTRODUCTION

This matter having come before the Court on a Motion by Defendants Sanofi-Aventis U.S., LLC and Sanofi-Aventis, U.S., Inc. (collectively, "Defendants" or "sanofi-aventis US") to "compel more detailed responses to Defendants' Second Set of Interrogatories...and...the identification and production of a witness for deposition" [dkt. entry. no. 142], returnable June 6, 2011.  Plaintiff Eisai Inc. ("Plaintiff" or "Eisai") filed opposition on May 23, 2011.  Defendant filed a reply brief on May 26, 2011.  The Court conducted oral argument on October 19, 2011. For the reasons stated herein, Defendants' Motion is **GRANTED** in part and **DENIED** in part.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff has marketed "Fragmin, a type of injectable anticoagulant drug" in the United States since 1996.  *See* Pl.'s Compl., dkt. entry no. 1 at 2.  Defendants market a competitor "anticoagulant product known as Lovenox".  *Id.*  On August 18, 2008, Plaintiff filed a Complaint alleging "monopolization of all relevant markets" pursuant to 15 U.S.C. § 2 (*see* Pl.'s Compl. at 21), "attempted monopolization of all relevant markets" pursuant to 15 U.S.C. § 2 (*Id.* at 22), "sale on condition not to use goods of competitor and to force use of full line of Lovenox goods

in all relevant markets" pursuant to 15 U.S.C. § 14 (*Id*. at 23), "agreements in restraint of trade in all relevant markets" pursuant to 15 U.S.C. § 1 (*Id*. at 23-24), and violation of the "New Jersey Antitrust Act" pursuant to N.J.S.A. §§ 56:9-3 and 56:9-4 (*Id*. at 24-25), based upon Plaintiff's contention that Defendants designed "contractual practices...to preserve...[their] substantial and enduring monopoly in the market for injectable anticoagulant drugs" as Plaintiff contends that Defendants account "for in excess of 90% of all sales for these drugs" (*Id*. at 1-2).

More specifically, Plaintiff alleges that Defendants have "expanded, protected, and maintained [their] monopoly power unlawfully, through a variety of anticompetitive means, including exclusionary contracts that draw upon and further protect the monopoly position of Lovenox".  *Id*. at 2.  Plaintiff asserts that "Lovenox contractual provisions require that a hospital customer purchase at least 90% of its relevant injectable anticoagulant purchases from Defendants...[in order] to avoid losing a discount of up to 30% off the customer's total Lovenox purchases", a provision which Plaintiff refers to as "the monopoly-share contractual condition". *Id*.  "Once a hospital's purchases fall below 90%, it forfeits significant discounts" and, if "the customer purchases less than 75% of its requirements from Defendants, the customer receives only a 1% discount".  *Id*.  Plaintiff maintains that Defendants do "not offer the Lovenox discount without the monopoly-share contractual condition".  *Id*.  As a result, Plaintiff alleges, the "monopoly-share condition causes anticompetitive effects in at least two ways".  *Id*. at 3.

"First, [the monopoly-share condition] operates as a *de facto* one-way exclusive dealing arrangement" such that "[i]n order to obtain the discount, a hospital must effectively agree to take at least 90% of its requirements from Defendants" and thereby "effectively [places] a...10% [cap] on Defendants' anticoagulant competitors' combined sales to hospitals".  *Id*.  Thus, Plaintiff contends, Defendants' practices "blockad[e] entry by any firm not already in the market by

assuring that after entry no new entrant [can] compete for more than 10% of market sales", "forestall effective competition from Plaintiff...by imposing barriers to Plaintiff's expansion of its market share...[and] thereby disabling Plaintiff from obtaining the same reputational advantages and economies of scale in manufacturing, marketing, and distribution that Defendants enjoy", and "deny consumers unrestricted choice of products, suppress improvements in patient care, reduce innovation, and prohibit lower prices". *Id.* at 4. "Second, the monopoly-share condition restricts Plaintiff's ability to obtain formulary status at hospitals...by erecting a substantial barrier to inclusion in hospitals' formularies". *Id.* Plaintiff maintains that "Lovenox already enjoys a 90% market share and is the predominant drug on most hospital formularies" such that "replacing Lovenox with a new anticoagulant drug within that formulary is costly and time consuming for any hospital" and, "although Fragmin and Lovenox are both approved for a variety of uses, Lovenox has obtained a comparative stronghold with respect to certain uses". *Id.* Thus, Plaintiff contends, Defendants' "monopoly-share condition operates so that a hospital that wishes to purchase anticoagulant drug products at the lowest price has no effective alternative other than to purchase at least 90% of its product needs from Defendants" and therefore "excludes rival anticoagulant sellers from hospitals". *Id.* at 4-5.

On January 10, 2011, Defendants served interrogatories "seeking specific information about Plaintiff's lost business resulting from Defendants' allegedly anticompetitive conduct". *See* Def.'s Decl. of David Gelfand ("Gelfand"), dkt. entry no. 142-2, Ex. H at 3. Specifically, Defendants' interrogatories requested the following information:

> 2.    Identify every customer or potential customer of Fragmin that purchased less Fragmin than it otherwise would have as a result of the Lovenox Discount Program ("Program") and/or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case. For each customer or potential customer, provide the following information: (1) the

name and contact information for all employees or representatives of the customer or potential customer who dealt with any employee or representative of Eisai in discussing purchases or potential purchases from Eisai; (2) the names of all Eisai employees, contractors, or other representatives who are knowledgeable about the circumstances surrounding the loss of Fragmin sales to the customer or potential customer; and (3) a description of the circumstances surrounding the loss of Fragmin sales to the customer or potential customer.

3.      Identify every customer or potential customer of Fragmin during the relevant time period that declined to place Fragmin on its formulary as a result of the Program and/or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case.  For each such customer or potential customer, provide the following information: (1) the name and contact information for all employees or representatives of the customer or potential customer who dealt with any employee or representative of Eisai in discussing the possible placement of Fragmin on formulary; (2) the names of all Eisai employees, contractors, or other representatives who are knowledgeable about the circumstances surrounding the customer's or potential customer's decision not to place Fragmin on formulary; and (3) a description of the circumstances surrounding the decision by the customer or potential customer not to place Fragmin on formulary.

4.      For every customer or potential customer of Fragmin during the relevant time period that purchased less Fragmin than it otherwise would have or that declined to place Fragmin on its formulary as a result of the Program or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case, identify what Eisai did to counter, respond to, or compete with any and all such contracts, practices, or acts including but not limited to a detailed description of any discounts, or other responsive actions taken by Eisai to obtain formulary status for Fragmin or to obtain sales of Fragmin to the customer or potential customer.

*Id.*, Ex. A.

In response to Defendants' Interrogatory No. 2, Plaintiff stated:

2.      ...Objection.  This Interrogatory seeks information already known to Defendants, and supported by information and documents already in Defendants' possession. ...Eisai states that

> from the time that Defendants or their predecessors implemented the anti-competitive Program, every Lovenox customer whose purchase of Lovenox was subject to or related, directly or indirectly, to the Program may have purchased less Fragmin or other LTC products than it otherwise would have due to the Program and/or Defendants' anticompetitive behavior. ...Below are some examples that...reflect Defendants' anticompetitive behavior, which have interfered with customers' choices and effectively foreclosed the LTC market (Eisai has learned of these events through its interaction in the field with customers and with Lovenox representatives).

*Id*., Ex. B at 4-5.   Additionally, Plaintiff provided general information about anticompetitive practices that impacted hospitals, HMOs, and customers in certain areas without including the names or contact information of any customers, potential customers, or Eisai employees.   *Id*. at 5-6.   Thereafter, Plaintiff added:

> Eisai is confident...that these practices have occurred on a regular basis at hospitals and hospital systems in every part of the United States since Lovenox has been in the market.   Eisai has sought discovery from Defendants in this regard, and fully expects that Defendants' discovery will identify many more examples; to date, Defendants have refused to begin searching for said discovery.
>
> In addition, upon agreement of the parties regarding the scope of discovery related to the field sales force, Eisai will identify information responsive to subsections (2) and (3), to the extent said information is available and appropriate.   In accordance with the Court's scheduling order, Eisai also will produce its expert reports, which Eisai anticipates will discuss the impact on customers and patients of Defendants' anticompetitive behavior, and will set forth the damages Eisai has sustained due to Defendants' foreclosure of the LTC market.   Eisai reserves the right to supplement this Answer as discovery proceeds in this case.

In response to Defendants' Interrogatory No. 3, Plaintiff stated:

> 3.      Objection.   This Interrogatory seeks information already known to Defendants, and supported by information and documents already in Defendants' possession. ...This Interrogatory also seeks information not in the custody of Eisai, but within the control of third parties; logic dictates that customers forced to refuse Fragmin and/or other LTC products due to Defendants'

> behavior may not inform Eisai of such. ...[B]ased on a review of
> the contracts produced thus far by Defendants, a production that is
> incomplete, below is a list of some Lovenox customers that have
> not purchased Fragmin.

*Id*., Ex. B at 7-8.   Notwithstanding this objection, Plaintiff provided the names of ten (10)

customers, without including any individual names or contact information or any description of

the surrounding circumstances.  *Id*. at 8.  Thereafter, Plaintiff reiterated:

> In addition, upon agreement of the parties regarding the scope of
> discovery related to the field sales force, Eisai will identify
> information responsive to subsections (2) and (3), to the extent said
> information is available and appropriate.  In accordance with the
> Court's scheduling order, Eisai also will produce its expert reports,
> which Eisai anticipates will discuss the impact on customers and
> patients of Defendants' anticompetitive behavior, and will set forth
> the damages Eisai has sustained due to Defendants' foreclosure of
> the LTC market.   Eisai also states that from the time that
> Defendants or their predecessors implemented the anticompetitive
> Program, the choices of every Lovenox customer whose purchase
> of Lovenox was subject to or related, directly or indirectly, to the
> Program have been illegally restricted, by the Program and/or
> Defendants' anticompetitive behavior. ...Eisai reserves the right to
> supplement this Answer as discovery proceeds in this case.

*Id*., Ex. B at 8-9.  In response to Defendants' Interrogatory No. 4, Plaintiff stated:

> 4.      See Objections and Answers to Interrogatory Nos. 2 and 3.
> Eisai also refers Defendants to the documents it will produce on a
> rolling basis throughout the discovery process, which includes
> contracts, brand plans, sales, marketing, and pricing analyses,
> promotional materials, sales training, and other documents that
> reflect Eisai's unsuccessful efforts to compete against Defendants'
> anticompetitive and monopolistic behavior.  In accordance with the
> Court's scheduling order, Eisai also will produce its expert reports,
> which will inform on Defendants' foreclosure of the market and
> the damages suffered by Eisai as a result.  Eisai reserves the right
> to supplement this Answer as discovery proceeds in this case.

*Id*., Ex. B at 8-9.

On March 7, 2011, Defendants sent a letter seeking to clarify Plaintiff's responses,

requesting "a complete list of every customer and instance responsive to these requests",

requesting "information regarding every potential customer with whom Eisai actively sought or took affirmative steps to have Fragmin placed on formulary but was declined", and confirming that Plaintiff would "not withhold any documents or information on the basis of [its] objection" that "discovery from Defendants will be the greatest source of information". *Id.*, Ex. C at 1-3. On March 9 and 16, 2011, the parties met and conferred on the concerns outlined in Defendants' March 7, 2011 letter. *Id.*, Ex. D at 1. In a letter dated March 21, 2011 summarizing the results of their meet and confer sessions, Defendants stated that "Eisai continues to refuse to provide a comprehensive and exhaustive list of specific customers known to Eisai that were allegedly lost as a result of the Program" despite the fact that "Eisai acknowledged that Defendants [are] entitled to the information responsive to these interrogatories" and "has agreed to search for and produce documents relating to its alleged lost business". *Id.*, Ex. D at 1-2. In an attempt to obtain the requested discovery "through an alternative route, on March 23, 2011 Defendants served a Notice of Rule 30(b)(6) Deposition upon Eisai" that included "topics...[which were] the subject matter sought in Defendants' interrogatories". *Id.*, Ex. H at 3; *see also Id.*, Ex. E.

On April 4, 2011, Plaintiff responded to Defendants' March 21, 2011 letter and stated that "Eisai does not and has not refused to comprehensively respond to" Interrogatory Nos. 2, 3, and 4 and Document Request No. 4 which seek "the identities of customers who either declined to purchase Fragmin or purchased less Fragmin based on Defendants' anti-competitive practices". *Id.*, Ex. G at 2. Rather, "Eisai has fully answered the requests, and in fact, has produced more information than was sought in the requests" and "made it abundantly clear in its formal responses...that it believes every contract and every customer subject to the Program and Defendants' other anti-competitive behavior by its sales force is one that may have purchased less Fragmin or declined altogether to purchase Fragmin". *Id.* Plaintiff stated that "as discovery

continues and it is appropriate, Eisai will supplement these responses" because it "has every intention of fully complying with its discovery obligations". *Id*. However, Plaintiff also contends that Defendants' "request that Eisai confirm if the examples given in its interrogatory responses constitute a complete universe of specific customers or alleged instances currently known to Eisai" is "not an obligation contemplated by the rules of discovery" because the "parties...[are only required to] produce responsive discoverable information within a timely manner during the discovery period...to ensure that there is no unfair surprise at trial". *Id*. Separately, on April 4, 2011, Plaintiff responded to Defendants' March 23, 2011 Notice of Rule 30(b)(6) Deposition stating that it would "not produce a responsive witness" at this time because the notice "was premature" based upon "the current state of discovery" and because "the notice contains several subjects that are objectionable on a variety of grounds including the attempt to require Eisai to designate a corporate witness to testify as to legal conclusions". *Id*., Ex. F at 1. "Regarding the current state of discovery, although Defendants have started the process of producing documents..., [Eisai has] not been provided any estimates from Defendants as to when production will be complete or on what schedule [Eisai] will likely receive documents". *Id*. In addition, "Eisai served subpoenas on Defendants for depositions...on August 20, 2009...[and] January 17, 2011" but has "received no deposition dates for these deponents" to date. *Id*. Plaintiff insists that "Defendants honor their pending discovery obligations...before Eisai...respond[s] to the deposition notice". *Id*. "Once [Eisai is] provided with a better understanding of when...Defendants' documents...[will be produced] and when the...previously requested depositions of Defendants' employees will be scheduled, [Eisai] will be in a better position to determine the appropriate timing for the deposition of an Eisai witness responsive to this request" and "will be happy to discuss the scope of the notice...in an effort to resolve any

disputes prior to the deposition". *Id*.  The Court notes that it appears the "parties did not meet-and-confer regarding this deposition notice".  *See* Pl.'s Opp'n Br., dkt. entry no. 144 at 3.

Based on these continuing discovery disputes, Defendants wrote to the Court on April 8, 2011.  *See* Def.'s Decl. of Gelfand, Ex. H.  Plaintiff responded in a letter dated April 19, 2011. *Id*., Ex. I.  On April 27, 2011, the Court conducted a telephone conference call and attempted to resolve the issues outlined by the parties.  *See* Pl.'s Opp'n Br., dkt. entry no. 144 at 1.  Plaintiff states that it understood the Court's views as expressed during the conference call to be as follows:

> (1) to the extent that Eisai' litigation team (including its outside counsel and inside counsel tasked with managing this litigation) was aware of lost customers and/or sales resulting from Defendants' anti-competitive conduct, such information was discoverable and had to be disclosed; and
>
> (2) to the extent that further information regarding lost customers and/or sales might exist within Eisai's sales force at large but was not currently known to the litigation team, such information should only be subject to discovery as part of any agreed upon sampling of the sales force.

*Id*. at 3.  "Given its understanding of the Court's guidance...[during] the April 27" conference call, "Eisai began preparing comprehensive and exhaustive supplemental discovery responses that disclosed all of the information related to the lost customers/sales topics of which the litigation team was aware".  *Id*. at 4.  Despite the fact that the parties "scheduled a further meet-and-confer on May 4, 2011", "[a]s directed by the Court", Plaintiff notes that the "day before this conference...Defendants filed the instant motion to compel – not based on the supplemental responses that Eisai had begun preparing after the April 27" conference call, "but on the Original Responses of February 14".  *Id*.  On May 9, 2011, Plaintiff maintains that it "served its Supplemental Responses" which "identify, in exhaustive detail, all information known to Eisai's

litigation team on the lost customer/sales issue, including the identity of customers, the identity

of Eisai and customer employees with relevant information, the circumstances of the anti-

competitive conduct, and Eisai's efforts to market to customers".  *Id*.  Specifically, Plaintiff's

supplemental responses state the following:

> 2.    ...[I]n supplement to its prior answer, Eisai states that below is
> information obtained through its own internal investigation and the
> limited discovery conducted thus far.  Eisai has not interviewed
> every employee and former employee that worked on Fragmin to
> ascertain the full scope of Eisai's knowledge.  However, Eisai
> underscores that it is confident, and indeed Defendants'
> monopolistic 90% share of the relevant market and the widespread
> proliferation of anticompetitive behavior strongly suggests, that
> although an incident with a specific customer may be identified
> below, these practices are occurring on a regular basis at hospitals
> and hospital systems in every part of the United States.  Eisai
> further emphasizes that, as is the case with Brian Miller's custodial
> file, Defendants' document production will uncover more such
> instances and customers.  Indeed, much of Eisai's information at
> this early stage of discovery is from Fragmin customers who have
> indicated that they have withstood Defendants' tactics aimed at
> prohibiting them from purchasing Fragmin.  Eisai anticipates that
> Defendants' documents will uncover the multiple customers who
> could not withstand Defendants' tactics and were forced to
> purchase Lovenox over another, cheaper but comparable, low
> molecular weight heparin.  To the extent that Eisai's investigation
> identified a customer employee with direct knowledge of a specific
> incident, the person is identified below.  However, generally, Eisai
> understands that the employees in the Pharmacies at the various
> hospitals tend to be the targets of Defendants' tactics resulting in
> lost business to Eisai and others in the relevant market.    All
> information below is based on Eisai's information and belief, and
> in addition to the individuals identified, Mary Myers has
> knowledge regarding Defendants' illegal behavior, its impact on
> customers, and the detrimental effect on Eisai and other members
> of the relevant market.  No employee identified below may be
> contacted except through counsel for Eisai.

*See* Pl.'s Opp'n Br., dkt entry no. 144-3, Ex. C at 6-7.  Plaintiff went on to provide additional

information about anticompetitive practices that impacted hospitals, HMOs, and customers in

certain areas and identified some customers, potential customers, and Eisai employees by name

and location by state or region for some.  *Id*. at 7-13.  Thereafter, Plaintiff added:

> Eisai reserves the right to supplement this Answer, as permitted by the Federal Rules.
>
> 3.     Eisai incorporates its initial objections and answer.   In supplement, Eisai refers Defendants to Answer and Supplemental Answer to Interrogatory No. 2, which incorporates the information responsive to this Interrogatory.  Any customer that is prohibited from putting Fragmin on its formulary due to Defendants' anticompetitive behavior vis a vis Lovenox is one who has purchased less Fragmin than it otherwise would have but for Defendants' conduct.  Further, because of the pervasive nature of Defendants' conduct, Eisai contends that every Lovenox customer that has not purchased Fragmin is one that was prohibited from doing so by Defendants' conduct.  Accordingly, as discovery continues – of third parties and Defendants – Eisai will identify additional customers.
>
> 4.     In supplement, Eisai states that, because Defendants are a monopoly, with more than a 90% share of the market, including before Eisai began selling Fragmin, every action and effort by Eisai to compete in the market necessarily constitutes a counter or response to Defendants' anticompetitive behavior.  Accordingly, Eisai refers Defendants to the promotional, marketing, sales, sales training, brand plan, contracting, and other documents that have been produced and will continue to be produced throughout discovery, which show Eisai's efforts to market and sell Fragmin within the artificial, monopolistic environment created by Defendants.  In addition, regarding instances of improper conduct by Lovenox representatives with specific customers, when Fragmin sales representatives learned of such conduct, they worked with the customers to provide on label and accurate information from which the customers could make their purchasing and prescribing decisions.   See also Answer and Supplemental Answer to Interrogatory No. 2, which identifies employees at Eisai who have knowledge of their specific responses to Defendants' counsel.  Mary Myers, former Director, Sales Operations, Oncology Administration, and Gary Woods, former Field Sales Director, Institutional Care, both of whom were identified in Eisai's initial discovery responses, also have knowledge about the efforts made by Eisai to address specific acts of misconduct towards customers.  Eisai reserves the right to supplement this Answer, as provided by the Federal Rules.

*Id*. at 13-16.

The Court notes that Defendants' Motion was filed on May 3, 2011.  *See* dkt. entry no.

142.  In a reply brief filed on May 26, 2011, Defendants maintain that Plaintiff's supplemental

responses remain inadequate (*see* dkt. entry no. 145) and seek the following relief:

> 1.   Eisai shall fully respond to Interrogatory numbers 2, 3, and 4 of Defendants' Second Set of Interrogatories in accordance with the Federal Rules of Civil Procedure within [____] days of this Order.

> 2.   Eisai shall supplement its Answers to sanofi-aventis US's Interrogatory numbers 2, 3, and 4 to provide the following information currently known to Eisai:

> a.   the name and contact information for every customer or potential customer that purchased less Fragmin than it otherwise would have as a result of the Lovenox Discount Program and/or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case;

> b.   the name and contact information for all employees or representatives of the customer or potential customer who dealt with any employee or representative of Eisai in discussing purchases or potential purchases from Eisai;

> c.   a description of the circumstances surrounding the loss of Fragmin sales to the customer or potential customer;

> d.   the name and contact information for every customer or potential customer of Fragmin that declined to place Fragmin on its formulary as a result of the Program and/or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case, or in the alternative, Eisai should confirm if there are no such customers currently known to Eisai;

> e.   the name and contact information for all employees or representatives of the customer or potential customer who dealt with any employee or representative of Eisai in discussing the possible placement of Fragmin on formulary, or in the alternative, Eisai should confirm if there are no such customers currently known to Eisai;

> f.   the names of Eisai's employees, contractors or other

representatives who are knowledgeable about the circumstances surrounding the customer's or potential customer's decision not to put Fragmin on formulary, or in the alternative, Eisai should confirm if there are no such customers currently known to Eisai;

g.      a description of the circumstances surrounding the decision by the customer or potential customer not to place Fragmin on formulary, or in the alternative, Eisai should confirm if there are no such customers currently known to Eisai; and

h.      for every customer or potential customer of Fragmin that purchased less Fragmin than it otherwise would have or that declined to place Fragmin on its formulary as a result of the Program and/or any other practice or act by sanofi-aventis US that is alleged to be part of the antitrust violation asserted in this case, identify what Eisai did to counter, respond to, or compete with any and all such contracts, practices, or acts including but not limited to a detailed description of any discounts, or other responsive actions taken by Eisai to obtain formulary status for Fragmin or to obtain sales of Fragmin to the customer or potential customer, or in the alternative, Eisai should confirm if there were no such specific actions taken to counter, respond to, or compete with sanofi-aventis US currently known to Eisai.

3.      No later than _____, 2011, Eisai shall identify and produce a witness knowledgeable about the topics listed in the Notice of 30(b)(6) Deposition served on Eisai on March 23, 2011.

*See* Def.'s Proposed Form of Order, dkt. entry no. 145-1, Ex. C.

A.      **Defendants' Arguments in Support of the Motion**

In reply to Plaintiff's opposition and contention that its supplemental responses to the interrogatories at issue moot this Motion, Defendants note that "Plaintiff's supplemental answers were only provided after both an informal application and the instant motion were made to the Court" and "advise what remains at issue in [their] motion to compel". *See* Def.'s Reply Br., dkt. entry no. 145 at 1. Defendants maintain that while Plaintiffs' supplemental answers "are a step in the right direction", they "remain insufficient" because they "continue to assert broad,

13

sweeping responses...without the detail requested...and fail to address Defendants' need for a Rule 30(b)(6) deposition on these particular topics". *Id*. Defendants argue that they "cannot proceed with discovery against all the third party hospitals that Plaintiff claims form the basis of its alleged foreclosure from the anticoagulant market because Plaintiff continues to represent that every Lovenox customer that has not purchased Fragmin is one that was prohibited from doing so by Defendants' conduct". *Id*. at 1-2. Defendants contend that it "is impractical to expect [them] to conduct discovery of the entire universe of U.S. hospitals (over 5,000) without any specific evidence of foreclosure from Plaintiff, particularly because Plaintiff has admitted that some of its own examples may not reflect business lost as a result of Defendants' allegedly anticompetitive conduct". *Id*. at 2. "If the only known instances of lost business due to Defendants' allegedly anticompetitive behavior are those included on the list provided in its answers and supplemental answers", Defendants argue that "Plaintiff should confirm this rather than continuing to make unsupported blanket assertions". *Id*. Despite Plaintiff's representations, Defendants "request that the Court...compel Plaintiff to appropriately respond to the interrogatories propounded...and to produce a competent witness to testify on the topics covered in those interrogatories". *Id*.

### 1.   Plaintiff's supplemental answers regarding allegedly lost sales remain incomplete.

Defendants' "Interrogatory 2 requests information regarding lost sales including the name and contact information for all employees or representatives of the customer or potential customer who dealt with any employee or representative of Eisai in discussing purchases or potential purchases from Eisai". *Id*. Defendants maintain that "[o]f the examples listed in Eisai's Supplemental Answers, several fail to appropriately identify the hospital" while others "continue to refer only to regions including customers in the Houston area or customers in central

California".  *Id*.  "Without the names and identifying information", Defendants argue that "it is impossible to collect discovery on these hospitals".  *Id*.  By way of example, Defendants point out that "Eisai identifies St. Joseph's Hospital and Baptist Hospital as Fragmin customers, but does not provide a complete name, location, or hospital contact for either institution".  *Id*. Defendants "cannot move forward with subpoenas because over 80 hospitals use St. Joseph and over 60 hospitals use Baptist as part of their names".  *Id*.  Defendants contend that "the identity of its own customers must be known to Eisai...and[,] consistent with its discovery obligations, Eisai should provide complete information to Defendants".  *Id*.

Defendants also note that "[c]ustomer contact names are also important to determine where responsive information can be found within these hospitals, some of which are enormous systems with hospitals in multiple states".  *Id*. at 2-3.  "Of the alleged examples of lost sales provided in Eisai's Supplemental Answers, almost half fail to identify any employee or representative of the customer or potential customer".  *Id*. at 3.  Defendants point out that they have "already received objections to subpoenas served on hospitals because they do not identify any particular person associated with Eisai's allegations".  *Id*.  "Without identifying individual employees or representatives of the customer", third parties served with subpoenas "are unable to meaningfully respond and Defendants must somehow address the objections for lack of specificity, where the specificity required is in the complete control of Eisai".  *Id*.  Defendants maintain that "[a]bsent additional information regarding the specific hospitals and contacts at these institutions who purportedly made statements to Eisai employees regarding the Lovenox contract or actions by Defendants' sales representatives, there is...no way for Defendants to investigate these allegations".  *Id*.  "If Eisai truly conducted an investigation and interacted in the field with customers and with Lovenox representatives as it claims to have done", Defendants

15

assert that Eisai "should be able to provide specific answers to this interrogatory". *Id.* As such, Defendants request that the "Court order Eisai to provide a complete response...that specifically identifies, by name and contact information, each hospital or facility and each customer or potential customer contact that are responsive to the request". *Id*.

**2. Plaintiff has not provided any specific information regarding restrictions on formulary access.**

Defendants note that "Interrogatory 3 seeks information regarding specific hospitals which have allegedly refused to place Fragmin on formulary as a result of the Lovenox contract and/or anticompetitive actions by Defendants" and requests "specific information regarding the name and contact information for all employees or representatives of the customer or potential customer with knowledge regarding these allegations". *Id*. at 3. Initially, "Eisai admittedly only reviewed the contracts produced by Defendants and then parroted back a list of some Lovenox customers that have not purchased Fragmin, which included the names of 10 hospitals and none of the requisite contact information sought in the interrogatory". *Id*. Defendants contend that Plaintiff's original answer was "not responsive to the question posed" and note that "Eisai has since retracted the names of two of these hospitals because apparently they have purchased Fragmin after all". *Id*.

With respect to Plaintiff's supplemental answers, Defendants maintain that they "provide no information about specific hospitals...that have refused to place Fragmin on formulary due to the alleged anticompetitive conduct" and they "do not identify the individuals with relevant knowledge at the eight remaining hospitals that Eisai previously had identified as not having purchased Fragmin". *Id*. "Eisai returns to its blanket assertion that every Lovenox customer that has not purchased Fragmin is one that was prohibited from doing so by Defendants' conduct" and Defendants argue that this "vague, conclusory answer is inappropriate". *Id*. Defendants

contend that "Eisai can...[either] identify specific customers that it knows have refused to add Fragmin to their respective formularies as a result of Defendants' alleged misconduct or it cannot" and, if "no such hospitals are currently known, ...Eisai should confirm that". *Id*. at 3-4. As such, Defendants request that the "Court order Eisai to either (a) provide a complete response...that identifies, by name and contact information, each hospital or facility and each customer or potential customer contact that are responsive to the request, or (b) confirm in writing that there are no responsive hospitals or facilities currently known to Eisai". *Id*. at 4.

### 3.   Plaintiff has not provided any information about its steps to compete for business.

Defendants' "Interrogatory 4 seeks information on a customer-by-customer basis of what steps Eisai took to respond to lost sales or allegedly anticompetitive tactics by Defendants or to overcome barriers to obtaining formulary status for Fragmin". *Id*. at 4. Defendants maintain that "Eisai's Supplemental Answers fail to provide any customer-specific information...and merely state that when Fragmin sales representatives learned of such conduct, they worked with the customers to provide on label and accurate information from which the customers could make their purchasing and prescribing decisions". *Id*. Citing FED. R. CIV. P. 33(b)(3) and *Graco, Inc. v. PMC Global, Inc.*, 2011 WL 1114233, at *29 (D.N.J. 2011), Defendants argue that "[t]his vague response does not provide [them] with enough information to investigate Eisai's claims" and "Eisai cannot rely on such blanket assertions to satisfy its discovery obligations". *Id*. Citing FED. R. CIV. P. 33(b)(4), Defendants contend that it is "not sufficient for Eisai to refer generally to the marketing materials included in its production of documents in order to satisfy this request" because "Eisai must specify the records that must be reviewed in sufficient detail to enable the interrogating party to locate and identify them". *Id*.

Citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) and *R.J.*

*Reynolds Tobacco Co. v. Philip Morris, Inc.*, 199 F. Supp. 2d 362, 394-95 (M.D.N.C. 2002), *aff'd*, 67 Fed. Appx. 810 (4th Cir. 2003), Defendants maintain that "[w]hat Eisai did to compete pertains not only to the factual background of Eisai's Complaint, but also to the merits of Eisai's antitrust claims". *Id*. "If Eisai truly conducted an investigation and interacted in the field with customers and with Lovenox representatives as it claims to have done", Defendants assert that "Eisai should be able to provide specific answers to this interrogatory". *Id*. As such, Defendants request that the "Court order Eisai to provide a complete response to Interrogatory 4 that...provides customer-specific, responsive information". *Id*.

### 4.   Plaintiff's supplemental answers do not moot the need for a Rule 30(b)(6) deposition.

Defendants note that "Eisai addresses Defendants' Motion to Compel a Rule 30(b)(6) deposition in only a mere passing footnote in its Opposition brief" and "purports to argue that [Eisai's] Supplemental Answers...moot Defendants' right to seek relevant discovery by way of deposition testimony". *Id*. at 5. Defendants argue that "there is nothing in Eisai's Supplemental Answers that would obviate Eisai's obligation to produce a knowledgeable witness on the topics noticed". *Id*. Therefore, Defendants maintain that "the Court should order Eisai to produce the appropriate witness or witnesses who may testify to the topics identified in Defendants' Rule 30(b)(6) deposition notice". *Id*.

### B.   Plaintiff's Arguments in Opposition to the Motion

### 1.   Defendants' Motion is based on Plaintiff's original responses and is thus moot; Plaintiff's supplemental responses disclose all responsive information known to Plaintiff's litigation team.

Plaintiff notes that Defendants' Motion is "based on Plaintiff's original responses" and their contention that "Plaintiff refuses to identify the customers it is currently aware of who have refused to do business with Plaintiff as a result of the Program and alleged misconduct that is at

18

issue in this case"; "Plaintiff has identified four customers who purportedly told Plaintiff one thing or another about their Lovenox contracts and the names of ten other customers that allegedly have not purchased Fragmin but has apparently made no attempt to provide a complete list"; "the examples Plaintiff has provided of lost customers are vague...and Plaintiff has failed to provide any information at all identifying the knowledgeable individuals". *See* Pl.'s Opp'n Br., dkt. entry no. 144 at 5. Plaintiff maintains that "[w]hatever the merits of Defendants' assertions in regards to Plaintiff's original response, Defendants' assertions have no merit in light of Plaintiff's supplemental responses" and Defendants "presumably would not have filed the instant motion" if they had waited to receive the supplemental responses. *Id*.

Specifically, "Eisai's Supplemental Response provided detailed information (to the extent available)...regarding incidents in which Lovenox representatives: falsely represented to customers that the use of Fragmin carried increased risks of bleeding, DVTs and/or PEs; threatened customers with legal action when they considered expanded use of Fragmin; provided misinformation about their discounting structure and contract; reminded clinicians of the financial support that Defendants had provided; discouraged customers from proceeding with Fragmin formulary proposals; threatened systemwide loss of discounts if individual hospitals increased their use of Fragmin; promoted off-label uses of Lovenox; and engaged in misinformation and scare tactics regarding potential malpractice suits if physicians switched to Fragmin". *Id*. at 6. Further, "Eisai catalogued these specific incidents with the identities of over three dozen involved customers, dozens of identified Eisai employees, and almost two dozen customer representatives identified by name and/or title". *Id*. Plaintiff provides the text of its supplemental answer to Interrogatory No. 2 to support its assertion that same is "reasonable". *Id*. at 6-15. Separately, Plaintiff provides the text of its supplemental answer to Interrogatory No. 4

19

in order to demonstrate "Eisai's efforts to market to...actual or potential customers". *Id*. at 15-16. Both supplemental answers indicate that "Eisai reserves the right supplement...as permitted by the Federal Rules". *Id*.

Finally, Plaintiff notes that "as part of [its] ongoing document production, the parties have agreed to complete by July 22, 2011 the custodial files of, *inter alia*, the witnesses with relevant knowledge detailed above (other than that of the sales force at large...)". *Id*. at 16. "These custodial files include, among others, those of the home office employees likely to have discoverable information on this topic". *Id*. Plaintiff further notes that "Defendants [have] already issued non-party subpoenas to several customers identified by Eisai, including Tenet Healthcare, Texas Health Resources, University Community Hospital, Hospital Corporation of America, Wellmont Health System, DeKalb Medical Center, and HealthPartners HMO". *Id*.

### 2.  Any further discovery would require discovery of the sales force, which Defendants admit they do not seek.

Plaintiff maintains that "[a]ny further discovery of information regarding Eisai's lost customers – beyond that currently known to the litigation team – would require discovery of the sales force". *Id*. at 16. "However, because of the necessarily attendant burdens, the parties currently contemplate only a limited mutual sampling of discovery of the sales force".[1] *Id*. By way of example, Plaintiff states that "although discoverable information regarding Defendants' anti-competitive conduct is likely to exist within the knowledge and custodial files of most, if not all, of Defendants' more than 1,600 current and former Lovenox sales representatives, Eisai has agreed to limit its document discovery to just 75 sales representatives, less than 5% of the sales force, and deposition discovery of an even smaller number". *Id*. Plaintiff maintains that

---

[1] Parenthetically, the Court notes that Plaintiff takes the opposite position with in opposition to Defendants' application to compel the production of responsive documents from a targeted list of Plaintiff's field sales force representatives. *See* Pl.'s Opp'n Letter dated September 13, 2011.

Defendants have "agreed, in regards to the instant motion, that the discovery at issue pertains only to the information known to the litigation team...and not to the sales force at large".  *Id.* Plaintiff references Defendants' motion papers and their statement that all they seek "is to have the same information currently known to Eisai – not to require Eisai to further inspect all the files of its sales force or conduct interviews".  *Id.* at 16-17.  As such, Plaintiff maintains that "Defendants acknowledge that [they] seek no further relief than has already been provided in Eisai's Supplemental Responses".  *Id.* at 17.  Additionally, Plaintiff argues that the "same is true of Defendants' Rule 30(b)(6) Deposition Notice, through which Defendants seek to utilize an alternate method of gathering information currently known to Eisai about allegedly lost business as a result of Defendants' purportedly anti-competitive behavior".  *Id.*

## III.   DISCUSSION

### A.   Legal Standards

#### 1.   Discovery

Pursuant to FED. R. CIV. P. 26(b)(1), "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense" and "the court may order discovery of any matter relevant to the subject matter involved in the action", although "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence".  *See also Pearson v. Miller*, 211 F.3d 57, 65 (3d Cir. 2000).  Importantly, pursuant to FED. R. CIV. P. 26(b)(2)(C), "the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

> (i)   the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
>
> (ii)   the party seeking discovery has had ample opportunity

to obtain the information by discovery in the action; or

(iii)    the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

The precise boundaries of the Rule 26 relevance standard depend upon the context of each particular action, and the determination of relevance is within the discretion of the District Court. *See Barnes Found. v. Twp. of Lower Merion*, 1996 WL 653114, at *1 (E.D. Pa. 1996). Importantly, "Courts have construed this rule liberally, creating a broad vista for discovery". *Takacs v. Union County*, 2009 WL 3048471, at *1 (D.N.J. 2009)(*citing Tele-Radio Sys. Ltd. v. DeForest Elecs., Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981)); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978); *Evans v. Employee Benefit Plan*, 2006 WL 1644818, at *4 (D.N.J. 2006); *Jones v. Derosa*, 238 F.R.D. 157, 163 (D.N.J. 2006); *Caver v. City of Trenton*, 192 F.R.D. 154, 159 (D.N.J. 2000); *Lesal Interiors, Inc. v. Resolution Trust Corp.*, 153 F.R.D. 552, 560 (D.N.J. 1994). "Review of all relevant evidence provides each party with a fair opportunity to present an effective case at trial". *Jones*, 238 F.R.D. at 163; *see also Caver*, 192 F.R.D. at 159; *Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990). "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation...[and] either party may compel the other to disgorge whatever facts he has in his possession". *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). "Whether certain documents are relevant is viewed in light of the allegations of the complaint, not as to evidentiary admissibility". *Id.*; *see also Scouler v. Craig*, 116 F.R.D. 494, 496 (D.N.J. 1987). Importantly, "the party resisting discovery has the burden of clarifying and explaining its objections to provide support therefor". *Tele-Radio*, 92 F.R.D. at 375; *see also Gulf Oil Corp. v. Schlesinger*, 465 F. Supp.

913, 916-17 (E.D. Pa. 1979); *Robinson v. Magovern*, 83 F.R.D. 79, 85 (E.D. Pa. 1979); *Nestle Foods*, 135 F.R.D. at 104-105.

However, "a discovery request may be denied if, after assessing the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues, the District Court finds that there exists a likelihood that the resulting benefits would be outweighed by the burden or expenses imposed as a consequence of the proposed discovery". *Takacs*, 2009 WL 3048471, at *1; *see also Bayer AG v. Betachem, Inc.*, 173 F.3d 188, 191 (3d Cir. 1999). "The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry". *Takacs*, 2009 WL 3048471, at *1(*citing Bowers v. National Collegiate Athletic Assoc.*, 2008 WL 1757929, at *4 (D.N.J. 2008)); *see also Leksi, Inc. v. Federal Ins. Co.*, 129 F.R.D. 99, 105 (D.N.J. 1989); *Public Service Group, Inc. v. Philadelphia Elec. Co.*, 130 F.R.D. 543, 551 (D.N.J. 1990).

## 2.   Interrogatories to Parties

Pursuant to FED. R. CIV. P. 33,

> …(a)(2) Scope.  An interrogatory may relate to any matter that may be inquired into under Rule 26(b).  An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.
>
> …(b)(3) Answering Each Interrogatory.  Each interrogatory must, to the extent it is not objected to, be answered separately and fully in writing under oath.
>
> (4) Objections.  The grounds for objecting to an interrogatory must be stated with specificity.  Any ground not stated in a

timely objection is waived unless the court, for good cause, excuses the failure.

…(d) Option to Produce Business Records.  If the answer to an interrogatory may be determined by examining, auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by:

> (1) specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could; and

> (2) giving the interrogating party a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries.

"The more progressive approach to interrogatories dealing with legal matters is to view them in the factual context within which they arise".  *Microtron Corp. v. Minnesota Mining & Mfg. Co.*, 269 F. Supp. 22, 25 (D.N.J. 1967); *see also Singer Manufacturing Co. v. Brother International Co.*, 191 F. Supp. 322 (S.D.N.Y. 1960).  "If the answer might serve some legitimate purpose, either in leading to evidence or in narrowing the issues, and to require it would not unduly burden or prejudice the interrogated party, the court should require [an] answer".  *Id*.; *see also* 4 MOORE'S FEDERAL PRACTICE, 2d Ed. 2534; *Gagen v. Northam Warren Corp*., 15 F.R.D. 44 (S.D.N.Y. 1953).

### 3.   Deposition of a Corporate Designee

Pursuant to FED. R. CIV. P. 30(b)(6),

> In its notice or subpoena, a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination.  The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person

designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization. This paragraph (6) does not preclude a deposition by any other procedure allowed by these rules.

"Rule 30(b)(6) places the burden upon the deponent to 'make a conscientious good faith endeavor to designate the persons having knowledge of the matters sought...and to prepare those persons in order that they can answer fully, completely, unevasively, the questions posed...as to the relevant subject matters". *Costa v. County of Burlington*, 254 F.R.D. 187, 189 (D.N.J. 2008)(*quoting Harris v. New Jersey*, 259 F.R.D. 89, 92 (D.N.J. 2007)). "The duty of preparation goes beyond matters personally known to the designee or to matters in which the designee was personally involved, and if necessary the deponent must use documents, past employees, or other sources to obtain responsive information". *Harris*, 259 F.R.D. at 92-93. "While the rule may not require absolute perfection in preparation – it speaks after all of matters known or reasonably available to the organization – it nevertheless certainly requires a good faith effort on the part of the designate to find out the relevant facts – to collect information, review documents, and interview employees with personal knowledge just as a corporate party is expected to do in answering interrogatories". *Wilson v. Lakner*, 228 F.R.D. 524, 528-29 (D. Md. 2005). Pursuant to FED. R. CIV. P. 37(d)(1)(A), "the court where the action is pending may, on motion, order sanctions if: (i) a party or a party's officer, director, or managing agent – or a person designated under Rule 30(b)(6) or 31(a)(4) – fails, after being served with proper notice, to appear for that person's deposition...". Importantly, "when a witness is designated by a corporate party to speak on its behalf pursuant to Rule 30(b)(6), 'producing an unprepared witness is tantamount to a failure to appear' that is sanctionable under Rule 37(d)". *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000)(*quoting United States v. Taylor*, 166 F.R.D. 356,

363 (M.D.N.C. 1996)).

Notably, in *Novartis Pharms. Corp. v. Abbott Labs.*, 203 F.R.D. 159, 162-63 (D. Del. 2001), the Court denied Novartis' motion to compel a 30(b)(6) deposition where *Abbott Labs.* agreed to be bound by the testimony previously provided by an individual, who was deposed in his individual capacity, who would have been the designee for a 30(b)(6) deposition. In *Johnson v. Geico Cas. Co.*, 269 F.R.D. 406, 415-16 (D. Del. 2010), the Court granted – in part – Geico's motion for protective order as to a 30(b)(6) deposition notice based upon the fact that Geico previously "produced thousands of documents" and the plaintiff had "already deposed witnesses" with respect to the particular topic, finding that plaintiff's 30(b)(6) notice was "duplicative and unduly burdensome". In *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 234-36 (E.D. Pa. 2008), the Court granted New Horizont's motion for protective order as to a 30(b)(6) deposition notice based upon the fact that New Horizont failed to provide good cause as to why the subject topics "were not noticed at the previous two Rule 30(b)(6) depositions". *See also* FED. R. CIV. P. 26(b)(2)(C).

## B.    Defendants' Motion

Having reviewed Defendants' Interrogatory Nos. 2-4 and Plaintiff's answers thereto, the Court finds Defendants' requests are "relevant...[and] reasonably calculated to lead to the discovery of admissible evidence" pursuant to FED. R. CIV. P. 26(b)(1) and are within the "broad vista for discovery" afforded to litigants. *Takacs*, 2009 WL 3048471, at *1; *see also Tele-Radio*, 92 F.R.D. at 375; *Jones*, 238 F.R.D. at 163. The Court notes, however, that Defendants only seek "to have the same information currently known to Eisai – not to require Eisai to further inspect all the files of its sales force or conduct interviews". *See* Def.'s Br., dkt. entry no. 142-1 at 3. Based upon Plaintiff's representation that it "has provided all responsive information

regarding the lost customer/sales issue known to its litigation team after reasonable inquiry, including the identity of specific customers, the names of Eisai and customer employees, and the circumstances thereof", the Court finds that subject to supplementation by Plaintiff throughout the course of discovery – including upon production of custodial files and upon the "limited mutual sampling of discovery of the sales force" (Pl.'s Opp'n Br. at 16) – Plaintiff has, in part, adequately responded to Defendants' Interrogatory Nos. 2-4.   However, the Court directs Plaintiff to provide all responsive information in its possession and "currently known", absent an inspection of "all the files of its sales force or...interviews" of the sales force, with respect to Interrogatory Nos. 2-3 and including subparts (1)-(3) of both interrogatories.  If Plaintiff does not know the names or contact information for customers, potential customers, employees, contractors, or other representatives with knowledge regarding loss of Fragmin sales or a decision not to place Fragmin on formulary, it must so state.  If Plaintiff does not know the circumstances surrounding a loss of Fragmin sales or a decision not to place Fragmin on formulary, it must so state.  Similarly, with respect to Interrogatory No. 4, the Court directs Plaintiff to "specify the records that must be reviewed in sufficient detail to enable the interrogating party to locate and identify them" by referencing specific responsive documents by Bates number rather than categories of documents and by referencing specific individuals rather than department(s) absent an inspection of "all the files of its sales force or...interviews" of the sales force.  FED. R. CIV. P. 33(d)(1).  The Court notes that its direction is by way of example rather than fully inclusive of the information that Plaintiff should provide.  However, the Court further notes that Plaintiff may not avoid or limit its responses to Defendants' interrogatories by excluding specific information that it possesses based on its contention that discovery produced by Defendants may yield additional information or based on its contention

27

that "the choices of every Lovenox customer...have been illegally restricted...by the Program and/or Defendants' anticompetitive behavior" such that the universe of customers or potential customers is a sufficient response.  *See* Def.'s Decl. of Gelfand, Ex. B at 4-9.

With respect to Defendants' Notice of Rule 30(b)(6) Deposition, the Court notes that "a party may name as the deponent a public or private corporation...and must designate with reasonable particularity the matters for examination".  FED. R. CIV. P. 30(b)(6).  Further, the Court notes that this is not an instance where Plaintiff has agreed to be bound by the testimony of any other witness or where prior 30(b)(6) depositions have been taken.  *See Novartis Pharms. Corp.*, 203 F.R.D. at 162-63; see also *Johnson*, 269 F.R.D. at 415-16; *State Farm Mut. Auto. Ins. Co.*, 254 F.R.D. at 234-36.  Therefore, subject to a meet and confer session between the parties wherein a schedule for depositions should be set and the topics for deposition should be agreed upon, the Court finds that Defendants are entitled to conduct a 30(b)(6) deposition.  *See* Pl.'s Opp'n Br. at 3.

## IV.    CONCLUSION AND ORDER

The Court having considered the papers submitted and opposition thereto, and having conducted oral argument on October 19, 2011, and for the reasons stated on the record and set forth above;

**IT IS** on this 7th day of November, 2011,

**ORDERED** that Defendants' Motion to "compel more detailed responses to Defendants' Second Set of Interrogatories...and...the identification and production of a witness for deposition" [dkt. entry. no. 142] is **GRANTED** in part and **DENIED** in part consistent with the findings set forth above; and it is further

**ORDERED** that Plaintiff shall produce further information responsive to Interrogatory

Nos. 2-4 by **November 28, 2011**; and it is further

      **ORDERED** that Defendants shall identify 30(b)(6) topics by **November 14, 2011** and

Plaintiff shall designate a 30(b)(6) witness that can respond to those topics by **November 21,**

**2011**.

s/ *Douglas E. Arpert*
**DOUGLAS E. ARPERT**
**UNITED STATES MAGISTRATE JUDGE**
