**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| **EISAI INC.,** | : | Civil Action No.: 08-4168 (MLC) |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | **AND ORDER** |
| **SANOFI-AVENTIS U.S., LLC, et al.,** | : | |
| Defendants. | : | |
| _____ | : | |

**ARPERT, U.S.M.J**

This matter having come before the Court on the informal application of Defendants Sanofi-Aventis U.S., LLC and Sanofi-Aventis, U.S., Inc. (collectively, "Defendants" or "Sanofi"), by letter to the Court dated September 1, 2011, to compel the production of responsive documents from a targeted list of Plaintiff Eisai Inc.'s ("Plaintiff" or "Eisai") field sales force representatives. Plaintiff submitted opposition in a letter dated September 13, 2011. The Court held oral argument on October 19, 2011. For the reasons stated on the record and herein, Defendants' application to compel is **GRANTED**.

In sum, Plaintiff has marketed "Fragmin, a type of injectable anticoagulant drug", in the United States since 1996. *See* Pl.'s Compl., dkt. entry no. 1 at 2. Defendants market a competitor "anticoagulant product known as Lovenox". *Id*. On August 18, 2008, Plaintiff filed a Complaint alleging "monopolization of all relevant markets" pursuant to 15 U.S.C. § 2 (*see* Pl.'s Compl. at 21), "attempted monopolization of all relevant markets" pursuant to 15 U.S.C. § 2 (*Id*. at 22), "sale on condition not to use goods of competitor and to force use of full line of Lovenox goods in all relevant markets" pursuant to 15 U.S.C. § 14 (*Id*. at 23), "agreements in restraint of

trade in all relevant markets" pursuant to 15 U.S.C. § 1 (*Id*. at 23-24), and violation of the "New Jersey Antitrust Act" pursuant to *N.J.S.A.* §§ 56:9-3 and 56:9-4 (*Id*. at 24-25), based upon Plaintiff's contention that Defendants designed "contractual practices...to preserve...[their] substantial and enduring monopoly in the market for injectable anticoagulant drugs" as Plaintiff contends that Defendants account "for in excess of 90% of all sales for these drugs" (*Id*. at 1-2). More specifically, Plaintiff alleges that Defendants have "expanded, protected, and maintained [their] monopoly power unlawfully, through a variety of anticompetitive means, including exclusionary contracts that draw upon and further protect the monopoly position of Lovenox". *Id*. at 2. Plaintiff asserts that "Lovenox contractual provisions require that a hospital customer purchase at least 90% of its relevant injectable anticoagulant purchases from Defendants...[in order] to avoid losing a discount of up to 30% off the customer's total Lovenox purchases", a provision Plaintiff refers to as "the monopoly-share contractual condition". *Id*. "Once a hospital's purchases fall below 90%, it forfeits significant discounts" and, if "the customer purchases less than 75% of its requirements from Defendants, the customer receives only a 1% discount". *Id*. Plaintiff maintains that Defendants do "not offer the Lovenox discount without the monopoly-share contractual condition". *Id*. As a result, Plaintiff alleges that the "monopoly-share condition causes anticompetitive effects in at least two ways". *Id*. at 3. "First, [the monopoly-share condition] operates as a *de facto* one-way exclusive dealing arrangement" such that "[i]n order to obtain the discount, a hospital must effectively agree to take at least 90% of its requirements from Defendants" and thereby "effectively [places] a...10% [cap] on Defendants' anticoagulant competitors' combined sales to hospitals". *Id*. Thus, Plaintiff contends that Defendants' practices "blockad[e] entry by any firm not already in the market by assuring that

2

after entry no new entrant [can] compete for more than 10% of market sales", "forestall effective competition from Plaintiff...by imposing barriers to Plaintiff's expansion of its market share...[and] thereby disabling Plaintiff from obtaining the same reputational advantages and economies of scale in manufacturing, marketing, and distribution that Defendants enjoy", and "deny consumers unrestricted choice of products, suppress improvements in patient care, reduce innovation, and prohibit lower prices". *Id*. at 4. "Second, the monopoly-share condition restricts Plaintiff's ability to obtain formulary status at hospitals...by erecting a substantial barrier to inclusion in hospitals' formularies". *Id*. Plaintiff maintains that "Lovenox already enjoys a 90% market share and is the predominant drug on most hospital formularies" such that "replacing Lovenox with a new anticoagulant drug within that formulary is costly and time consuming for any hospital" and, "although Fragmin and Lovenox are both approved for a variety of uses, Lovenox has obtained a comparative stronghold with respect to certain uses". *Id*. Thus, Plaintiff contends that Defendants' "monopoly-share condition operates so that a hospital that wishes to purchase anticoagulant drug products at the lowest price has no effective alternative other than to purchase at least 90% of its product needs from Defendants" and therefore "excludes rival anticoagulant sellers from hospitals". *Id*. at 4-5.

With this informal application, Defendants note that although they "requested documents concerning the pricing, sales, and marketing of Fragmin...from the files of...48 Fragmin sales force employees", Plaintiff "objects to the...discovery...because [it] wants more discovery of [Defendants'] sales force...beyond the 75 custodian limit...set by [the] Cout's Order dated March 24, 2011". *See* Def.'s Letter dated September 1, 2011 at 1. Defendants maintain that Plaintiff's approach – "that it will not provide documents from the 48 requested Fragmin sales personnel

unless [Defendants] provide materials from an additional 163 Lovenox sales professionals" – finds "no support in the rules or case law and is an improper attempt by [Plaintiff] to condition its production of relevant materials in this case on other discovery". *Id*. More specifically, Defendants contend that because a cental issue in this case is "[w]hether the Lovenox Discount Program and other alleged misconduct actually caused customers to refuse to buy Fragmin...as opposed to...other factors like doctors' preferences, [Plaintiff's] failure to offer competitive discounts, inadequate marketing and customer service by [Plaintiff], lack of availability of Fragmin in the retail setting, etc.", Defendants served interrogatories asking Plaintiff to specify each customer known to have purchased less Fragmin than it otherwise would have or refused to place Fragmin on its formulary as a result of the Lovenox Discount Program or other alleged misconduct and "to identify the individuals...knowledgeable about those alleged incidents or customers". *Id*. at 2. Separately, Defendants served document requests seeking "[a]ll communications between [Plaintiff] and any of its customers or potential customers...concerning the marketing or promotion of Fragmin or any other anticoagulant", "[a]ll internal communications and documents concerning...the customers [mentioned above] including, but not limited to, all call notes, trip notes, call reports, and/or documents reflecting, analyzing, reporting on, or summarizing such communications...directly or indirectly", and "[a]ll performance evaluations for any Eisai personnel responsible for the sales, marketing, or promotion of Fragmin to any customer [mentioned above]". *Id*. at 2-3. After Plaintiff "produced a spreadsheet of sales force organizational information that lists approximately 469 individuals who were part of the Fragmin sales organization during the relevant period", Defendants "identified the 48 specific Eisai sales force representatives from whom it seeks documents in response to the pending

4

requests" set forth above. *Id*. at 3. Defendants contend that "[t]hese 48 sales representatives comprise the sum total of the Fragmin sales force discovery...[sought] at this time and represent only a small fraction of [Plaintiff's] overall Fragmin sales force". *Id*. at 3-4. Although the parties met and conferred on this issue, Defendants maintain that Plaintiff informed them "that it would produce sales force data for no more than 16 Fragmin sales force representatives of [Defendants'] choosing" and "would only produce files from the remaining 32 Fragmin sales force members...if [Defendants] produced files from an additional 164 Lovenox sales representatives...on top of the 75 that this Court [previously] ordered". *Id*. at 4.

Defendants cite FED. R. CIV. P. 26(b), *J.B.D.L. Corp. V. Wyeth-Ayerst Labs, Inc.*, 485 F.3d 880 (6th Cir. 2007), *Barr Labs., Inc. v. Abott Labs*, 978 F.2d 98, 111-15 (3d Cir. 1992), *Ortho Diagnostics Sys. v. Abbott Labs.*, 920 F. Supp. 455 (S.D.N.Y. 1996), *LePage's Inc. v. 3M*, 324 F.3d 141, 158 (3d Cir. 2003), *Virgin Atl. Airways v. British Airways*, 257 F.3d 256, 270-73 (2d Cir. 2001), *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997), *Nat'l Ass'n of Pharm. Mfrs. v. Ayest Labs*, 850 F.2d 904, 916 (2d Cir. 1988), *Berkey Photo v. Pharms. L.P.*, 534 F. Supp. 2d 146, 152 (D.D.C. 2008), and 3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 782b (3d ed. 2008) for the proposition that the requested field sales force discovery is relevant given that Plaintiff has identified "employees...with knowledge about the specific instances known to [Plaintiff] of hospitals that purportedly have declined to do business with it because of the alleged anticompetitive practices", that "[p]reliminary management-level discovery from [Plaintiff] has already revealed that a number of the hospitals identified in response to Interrogatory 2 actually had switched to

5

Fragmin", that "third-party discovery has demonstrated that certain other of the identified customers chose Lovenox over Fragmin simply because doctors prefer Lovenox and not as a result of any anticompetitive constraint imposed by the Lovenox discount structure", and that "[Plaintiff's] sales force holds the evidence of any of its efforts to neutralize or offset any supposed disparaging or incorrect...marketing practice at a particular hospital". *Id*. at 4-6. Defendants cite FED. R. CIV. P. 26(b), FED. R. CIV. P. 26(d)(2), *Nat'l Acad. of Recording Arts & Scis., Inc. v. On Point Events, LP*, 256 F.R.D. 678, 680 (C.D. Cal. 2009), *Lumbermens Mut. Cas. Ins. Co. v. Maffei*, 2006 WL 2709835, at *5 n.21 (D. Alaska 2006), *Acushnet Co. v. Birdie Golf Ball Co., Inc.*, 166 F.R.D. 42, 43 (S.D. Fla. 1996), 7 James W. Moore, *Moore's Federal Practice - Civil* § 37.22[2][a] (3d ed. 2010), *Takacs v. Union Cnty.*, 2009 WL 3048471, at *1 (D.N.J. 2009), and *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 1991 WL 183842, at *4 (E.D. Pa. 1991) for the proposition that the clear probative value of the requested field sales force discovery outweighs any burden on Plaintiff related to production given that the Court "has already determined that the likely benefit of search and producing files from any 75 [of Defendants] sales force representatives outweighs the associated burden", that Defendants are only asking for production related to 48 of Plaintiff's sales force representatives, that the Federal Rules do not provide for one party to withhold discoverable materials unless the other party produces additional materials in excess of those ordered, that there is no "rule or case that supports [Plaintiff's] argument that 'proportionate' discovery requires a mathematically precise calculation comparing the number of employees for each party", and that "the direct relevance of the discovery sought to the critical issues of antitrust injury, foreclosure, and causation...and the enormous amounts at stake" demonstrates that the request "for documents from 48 sales force

employees [is] clearly proportionate to the needs of the case". *Id*. at 6-8.

In opposition, Plaintiff maintains that Defendants want "disproportionately more discovery than that to which [Plaintiff] agreed" and that based upon Defendants' current position, "full discovery of the parties' field sales forces is necessary" or the Court "should order that proportional discovery be produced by Defendants". *See* Pl.'s Opp'n Letter dated September 13, 2011 at 1. Plaintiff notes that while there is no dispute that sales force discovery is relevant to this litigation, it originally "offered to limit discovery of the Lovenox sales force to a sampling of 10%" and subsequently agreed to "further limit this discovery to 75 sales representatives" given that "[t]he issue of additional discovery beyond those 75 sales representatives was tabled for a later date". *Id*. at 2. Plaintiff argues that because Defendants' "current request...[is] for a far greater proportion of the Fragmin sales force", and because Defendants' "position...[is] that [Plaintiff] must establish its claims on a customer-by-customer basis", "now is the proper time to address...additional discovery" that should be provided to Plaintiff by Defendants. *Id*. Plaintiff maintains that Defendants' request for "discovery of 48 of [Plaintiff's] Fragmin field sales force employees...represents approximately 42% of the full-time equivalents working on Fragmin at a given time, or 11% of the entire sales force – a fraction similar to the 10% initially sought by [Plaintiff]...but rejected by [Defendants]". *Id*. "When confronted with this demand for a disproportionately large amount of discovery than the 3.5%/7.5% to which [Plaintiff] had agreed, [Plaintiff] responded that it...was willing to produce that discovery...so long as it was equitable between the parties...[but] Defendants rejected that proposal". *Id*. at 2-3. Plaintiff subsequently "offered to immediately produce the same proportion of sales force discovery (3.5%/7.5%) that [Defendants were] ordered...to produce", but to date Defendants "[have] not identified those 16

7

individuals...or otherwise accepted [Plaintiff's] offer". *Id*. at 3.

Plaintiff argues that "[t]he Court should open discovery of the entire field sales forces of both parties...for two reasons" – "the parties cannot agree on an equitable approach to producing...discovery...which both parties acknowledge is relevant and necessary to the litigation" and "[Defendants] contend that [Plaintiff] is required to prove its antitrust claims on a customer-by-customer basis...necessitating full discovery of every instance of anticompetitive behavior". *Id*. With respect to proportionality, Plaintiff claims that at that time it "offered to limit full sales force discovery..., [Defendants] had neither requested this discovery of Fragmin representatives...nor had they disclosed their approach to defending this litigation". *Id*. "Nonetheless, [Plaintiff] expected that any discovery of its sales force would be equitable and proportionate...given the legal ruling from the Court that this information was relevant and discoverable" and now, based upon the fact that Defendants "acknowledge the import of this discovery...but seek substantially more discovery than what [Plaintiff] agreed to..., the question of what is fair and equitable for both parties to produce should be revisited". *Id*. Plaintiff argues that "[i]t would be utterly unfair and without legal basis to grant [Defendants'] request for production of 48 sales representatives...without also granting [Plaintiff] proportionate discovery" because same "would result in...[Defendants having] access to relevant information...to try to support their defenses...while denying [Plaintiff] equal access to relevant information in support of its claims". *Id*. at 4. Plaintiff maintains that "unless the parties can come to an agreement", the "Court should order that full discovery be conducted". *Id*. With respect to Defendants' proffered defense, given Defendants' position that it "must conduct discovery of every Eisai sales employee that detailed every affected customer", Plaintiff contends that it "is forced to request

8

that the Court open up full field sales force discovery on both sides". *Id*. at 4-5. Noting that it alleges Defendants' behavior "has affected the entire market" and Defendants' proffered defense, Plaintiff argues that "the entire market must be investigated" because "without full sales force discovery [Plaintiff] would be prevented access to proof it may need to show both the illegal behavior by [Defendants] and the affect on each customer". *Id*. at 5. Plaintiff points out that Defendants' arguments "eliminate the [issue] of undue burden...which had formed the basis of [Plaintiff's] initial offer to limit this discovery" and that "opening up full discovery of the field sales forces at this time will eliminate both the inevitable need to re-visit discovery of particular employees...and the practical inefficiencies inherent in piecemeal collection and production". *Id*. at 5-6.

The Court notes that pursuant to FED. R. CIV. P. 26(b)(1), "parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense...including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter" and "the court may order discovery of any matter relevant to the subject matter involved in the action", although "relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence". Notably, "[t]he party resisting discovery has the burden of clarifying and explaining its objections and to provide support therefor". *Tele-Radio Systems, Ltd. v. De Forest Electronics, Inc.*, 92 F.R.D. 371, 375 (D.N.J. 1981); *see also Gulf Oil Corp. v. Schlesinger*, 465 F. Supp. 913, 916-17 (E.D. Pa. 1979); *Robinson v. Magovern*, 83 F.R.D. 79, 85 (E.D. Pa. 1979). The Court also notes that pursuant to FED. R. CIV. P. 26(d)(2), "[u]nless, on motion, the court orders otherwise for the parties' and witnesses' convenience and in the interests of justice[,]...(A) methods of discovery may be used in any sequence...[and] (B) discovery by one party does not require any other party to delay its discovery".

9

Here, the Court finds that Plaintiff does not dispute the relevance of the requested discovery. *See* Pl.'s Opp'n Br. at 2, 4. Previously, pursuant to the Court's March 24, 2011 Order, Plaintiff's field sales force discovery requests – and Defendants' production – was limited to seventy-five (75) representatives identified by Plaintiff. *See* dkt. entry no. 141. Although the Court acknowledges Plaintiff's argument – that production of field sales force discovery should be proportional based upon a certain percentage of each parties' respective total (or product specific) sales force – the Court finds that Plaintiff has failed to cite any law to support the proposition that it may withhold admittedly relevant discovery based on a proportionality objection. *See* FED. R. CIV. P. 26(d)(2). Therefore, the Court directs Plaintiff to produce field sales force discovery for the forty-eight (48) representatives identified by Defendants. Upon Plaintiff's completion of the field sales force discovery production ordered herein and Defendants' completion of the previously ordered field sales force discovery production, the parties may raise any remaining dispute(s) about additional request(s)/production(s) of field sales force discovery after attempting to resolve such issue(s) pursuant to their meet and confer obligations.

Having considered the papers submitted and the opposition thereto together with the parties' arguments during oral argument, and for the reasons set forth on the record and above;

**IT IS** on this 7th day of November, 2011,

**ORDERED** that Defendants' application to compel the production of responsive documents from a targeted list of Plaintiff's field sales force representatives is **GRANTED**; and it is further

**ORDERED** that Plaintiff shall produce the requested discovery by **November 28, 2011**.

s/ *Douglas E. Arpert*
**DOUGLAS E. ARPERT**
**UNITED STATES MAGISTRATE JUDGE**